# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1284
_____

United States of America

*Plaintiff - Appellee*

v.

Johnnie Lamar Haynes

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: December 15, 2022
Filed: March 13, 2023

_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.

_____

LOKEN, Circuit Judge.

After a three-day trial, a jury convicted Johnnie Lamar Haynes of being a felon in possession of a firearm and, in a separate count, of being a felon in possession of ammunition, following a shooting in north Minneapolis. See 18 U.S.C. §§ 922(g)(1), 924(a)(2). The district court imposed concurrent 115-month sentences on each count. Haynes appeals, arguing that there was insufficient evidence of the interstate commerce element of the firearm offense, insufficient evidence of possession of

ammunition, and that his sentence is substantively unreasonable. The government's appeal brief noted that the two counts are multiplicitous and should have been merged for sentencing purposes. We agree the firearm and ammunition convictions are multiplicitous as submitted to the jury. Therefore, one must be vacated to eliminate plain error prejudice, the two $100 special assessments. See Ray v. United States, 481 U.S. 736, 737 (1987). We otherwise affirm.

## I. Sufficiency-of-the-Evidence

**A. Background.** On the afternoon of August 5, 2019, a chiropractic clinic employee called 911 to report a shooting at the intersection of Lowry Avenue and North Logan Avenue. Bullets penetrated the front wall and window of the clinic located directly across the street from the Full Stop gas station. Fortunately, no one was injured in this mid-afternoon shooting at a busy intersection. After an investigation, a grand jury indicted Haynes and his cousin, Cortez Shipp, on charges of being felons in possession of a firearm and ammunition. Shipp pleaded guilty to being a felon in possession of ammunition and testified for the government at Haynes's trial.

Prior to trial, as in United States v. Obi, Haynes stipulated to two elements of a § 922(g)(1) felon-in-possession offense -- "a prior conviction for a crime punishable by imprisonment exceeding one year, and knowledge he is in a class of persons therefore barred from possessing a firearm or ammunition." 25 F.4th 574, 577 (8th Cir. 2022). Thus, the issues at trial were knowing possession of a firearm and ammunition "which has been shipped or transported in interstate or foreign commerce." § 922(g); Obi, 25 F.4th at 577.

The jury convicted Haynes of both charges. On appeal, he argues the evidence was insufficient to prove beyond a reasonable doubt (i) that he possessed a firearm

transported in interstate commerce before or during the shooting,[1] and (ii) that the ammunition introduced at trial was connected to the shooting or to Haynes. We summarize the relevant trial evidence in the light most favorable to the jury's verdict, accepting all reasonable inferences in favor of the verdict. See, e.g., United States v. Druger, 920 F.3d 567, 569 (8th Cir. 2019). "As long as one theory based on the evidence presented could allow for a reasonable jury to find [Haynes] guilty beyond a reasonable doubt, we must uphold the jury verdict." Id.

Responding Minneapolis police officers obtained surveillance videos from the Full Stop gas station where the shooting incident began. The videos show Haynes having an unfriendly encounter with two men in the Full Stop store. After completing a transaction, Haynes returns to his black vehicle parked at a gas pump. His cousin Shipp arrives. They converse, then walk to Logan Avenue. The other two men exit the store, drive away, and then return in a blue Pontiac. When Haynes sees the Pontiac heading back south on Logan Avenue towards the Full Stop, Shipp hands Haynes a loaded handgun. Haynes runs towards the northeast corner of Logan and Lowry, follows the Pontiac as it turns left onto Lowry in front of the Full Stop, and begins shooting. Haynes and Shipp flee the scene, with Haynes sprinting north on Logan and Shipp heading west on Lowry.

Minneapolis "ShotSpotter" data at the intersection recorded thirteen shots fired. Officers recovered eleven recently-discharged CBC 9-millimeter Luger shell casings at the curb of the intersection where the shooting occurred. Nearby residents reported finding a discarded 9-millimeter handgun magazine in their yard on Logan north of the intersection, the direction Haynes fled. Officers recovered the magazine. It was

_____

[1]Haynes argues as a separate issue that the district court erred in denying his motion for judgment of acquittal at the close of the government's case. See Fed. R. Crim. P. 29. We apply the same standard of review to the denial of an acquittal and to a sufficiency-of-the-evidence challenge. United States v. Cross, 888 F.3d 985, 990 (8th Cir. 2018).

in good condition and contained three live rounds of the same ammunition as the shell casings at the crime scene. Tests revealed Shipp's DNA on the magazine. Police never recovered the firearm used in the shooting.

Shipp testified he walked to the Full Stop gas station to buy cigarettes, carrying a handgun with 9-millimeter bullets in the magazine. He encountered Haynes at the Full Stop. Haynes told Shipp the two men in the blue Pontiac previously stole a firearm from Haynes and Shipp. Haynes knew Shipp was carrying a gun because Haynes occasionally borrowed it. When Haynes saw the blue Pontiac heading back towards the Full Stop, he asked for the gun and Shipp handed it to him. Shipp said the CBC 9-millimeter Luger bullets recovered at the scene of the shooting matched the type of ammunition he would have loaded into the magazine. He testified he did not know what company manufactured the gun. It "could have been" a Ruger but admitted he denied it was a Ruger when police showed him a photo of a Ruger in an earlier interview.

Responding officer George Warzinik testified that he recovered eleven discarded 9-millimeter CBC Luger shell casings from the curb at the northeast corner of the intersection. They were in "fairly good condition," meaning that "they were relatively recently fired." Both Warzinik and investigating officer Adam Lepinski testified that the location of the shell casings was consistent with where the videos showed Haynes was standing when he fired shots at the blue Pontiac. Residents of a home on Logan in the direction Haynes fled alerted Warzinik to the 15-round magazine they discovered on the west side of their fence. The magazine contained three live rounds of 9-millimeter Luger bullets matching the discarded shell casings. The magazine was in "very good condition," indicating it had been "relatively recently dropped." A forensic scientist testified that the major DNA profile on the magazine matched Shipp's DNA. There was insufficient DNA to profile the discharged casings, which is not unusual.

Sergeant Lepinski, the officer who arrested Haynes on August 17, testified that officers never recovered the firearm Haynes was using in the Full Stop surveillance videos, which is "very common." The recovered magazine was processed as evidence. Lepinski was charged with determining what firearm could have been used with the recovered magazine, bullets, and shell casings. Lepinski testified that gun manufacturers make magazines "to fit their firearms." He "test-fit" the recovered magazine into "20 to 30" handguns he pulled from the Minneapolis Police Department's gun vault. The 15-round magazine only "clicked into" a Ruger 9-millimeter pistol. Three live rounds were found in the 15-round magazine. ShotSpotter recorded 13 shots fired. Lepinski explained there was no discrepancy if a bullet was chambered when Shipp handed the gun to Haynes.

Special Agent Bryan Lervoog, the government's interstate nexus expert, testified that CBC 9-millimeter Luger ammunition is manufactured in Brazil and Ruger handguns that fit the magazine are manufactured outside Minnesota. On cross examination, Lervoog admitted that Ruger consistently affixes a prominent "Ruger" label to their guns, usually on both sides of the handle and on the slide, making it "pretty obvious when it's a Ruger gun." After testifying he was not aware of 9-millimeter firearms made in Minnesota, Lervoog was shown a Safety and Instructional Manual from Magnum Research, Inc. stating that its MR9 Eagle 9-millimeter handgun, a gun that Sergeant Lepinski did not test-fit with the recovered magazine, was made at Magnum's Pillager, Minnesota factory. Lervoog admitted that "Magnum Research has made firearms here in the past."

At the close of the government's case, the district court denied Haynes's Rule 29 motion for judgment of acquittal. Haynes waived his right to testify, and the defense rested.

**B. The Firearm Conviction.** To convict a defendant of being a felon in possession of a firearm, the government need not introduce the firearm into evidence. See, e.g., United States v. Abernathy, 277 F.3d 1048, 1050 (8th Cir. 2002). Here, the surveillance videos clearly show Shipp handing Haynes a handgun and Haynes then running after the blue Pontiac and shooting at its occupants. The main fighting issue at trial was whether the government proved that the unrecovered gun had traveled in interstate commerce before Haynes possessed it. See 18 U.S.C. § 921(a)(2).

The trial evidence on this issue, while not conflicting, was vigorously disputed. Police recovered a 15-round magazine with Shipp's DNA along Haynes's flight path that contained 9-millimeter Luger bullets matching the discarded shell casings found at the intersection where the videos showed Haynes shooting at the blue Pontiac. Lepinski testified that the magazine only "clicked into" a Ruger from the 20 to 30 different guns he pulled from the Minneapolis Police Department's gun vault. Agent Lervoog testified 9-millimeter Ruger guns are only manufactured outside Minnesota. But Shipp testified only that the gun he handed Haynes could have been a Ruger, after denying that it was in police interviews. And Lervoog admitted that a Magnum handgun manual (not admitted into evidence) stated that Magnum manufactures a 9-millimeter Eagle handgun in Minnesota.

We conclude the commerce element was a fact issue the district court properly left for the jury to resolve. A single answer during Sergeant Lepinski's redirect examination convinces us that the government's evidence on the interstate commerce element was not insufficient *as a matter of law*:

> So magazines are made by the manufacturer specific to fit their firearms . . . . I don't know if the jury can see this or not, but there's a little notch right there (indicating). You can actually see light through it. . . . That notch is in different locations based on the manufacturer. So if this fit into a gun and it also fit into another gun . . . it would only work in the one . . . if it actually goes in and . . . clicks in and you can't pull it out.

This testimony and Lepinski's test fitting provided affirmative evidence that the unrecovered firearm was a Ruger not made in Minnesota. Cross examination of Lervoog established that there may be a 9-millimeter handgun made in Minnesota. But a Magnum safety manual was the only evidence of that possibility. No Magnum 9-millimeter Eagle handgun was introduced into evidence, no Magnum witness provided foundation for the safety manual information, and there was no Magnum test-fitting evidence to counter the above quoted testimony by Lepinski. Shipp was thoroughly examined on his inconsistencies regarding whether the gun he handed Haynes was a Ruger. "The jury has the sole responsibility to resolve conflicts or contradictions in testimony, and credibility determinations are resolved in favor of the verdict." United States v. Nickelous, 916 F.3d 721, 724 (8th Cir. 2019) (quotation omitted); see United States v. Spencer, 50 F.4th 685, 689 (8th Cir. 2022). Here, the government presented sufficient evidence for a reasonable jury to find beyond a reasonable doubt that the firearm Haynes possessed during the shooting was manufactured outside of Minnesota. We affirm his conviction on Count 1.

**C. The Ammunition Conviction.** Haynes argues the government introduced insufficient evidence that he was the one who discarded the common cartridge casings and magazine that were found in a high crime area. He concedes there was evidence the shell casings were rather freshly discarded but argues that they could have come from a different shooting and the magazine with Shipp's DNA could have been from one of his other guns.

The government did not need to produce the firearm used in the shooting to convict Haynes of being a felon in possession of ammunition. See, e.g., United States v. Kelly, 436 F.3d 992, 996 (8th Cir. 2006); cf. United States v. Baber, 161 F.3d 531, 532 (8th Cir. 1998). Evidence that Haynes was the shooter, that the spent shell casings found at the scene came from the shooter's gun, and that the magazine was discarded or ejected from the shooter's gun was sufficient to be credited by a reasonable jury. See Obi, 25 F.4th at 577-78. As explained above, Officer Warzinik

-7-

and Sergeant Lepinski provided detailed testimony that permitted the jury to find that the magazine ejected the recently fired shell casings from the shooter's gun, and that the shooter discarded the magazine while fleeing the scene. Cf. United States v. Bailey, 831 F.3d 1035, 1039 (8th Cir. 2016) (felon discarded firearm during flight to avoid detection). Haynes does not challenge the evidence that the plainly-marked CBC 9-millimeter Luger ammunition was manufactured in Brazil and traveled in interstate commerce before the shooting. We affirm his conviction on Count 2.

## II. Sentencing Issues

**A. Substantive Reasonableness.** The district court determined that Haynes's advisory guidelines sentencing range is 100-125 months imprisonment. Denying his request for a downward variance, the district court imposed concurrent 115-month sentences on each count. On appeal, Haynes argues the sentence is substantively unreasonable because the court did not adequately account for the 28 months of harsh time he served in pretrial detention in a county jail under COVID-19 restrictions, and did not properly consider his violent, difficult childhood growing up in poverty, neglected by parents who struggled with drug addiction. The government argues the district court did not abuse its substantial sentencing discretion in carefully considering the relevant aggravating and mitigating 18 U.S.C. § 3553(a) sentencing factors and imposing a within-range sentence. We agree. A sentence within the advisory guidelines range is presumed reasonable. See United States v. Cosen, 965 F.3d 929, 932 (8th Cir. 2020). Haynes has not rebutted that presumption.

**B. Multiplicitous Convictions.** "If a defendant is charged with a single crime in multiple counts, those counts are multiplicitous, and subjecting the defendant to multiple punishments violates the Double Jeopardy Clause" of the Fifth Amendment. United States v. Grimes, 702 F.3d 460, 468 (8th Cir. 2012). The "operative question is whether the facts underlying each count were intended by Congress to constitute separate units of prosecution." United States v. Platter, 514 F.3d 782, 785 (8th Cir.

2008) (cleaned up).  In <u>United States v. Richardson</u>, we held that, in § 922(g) felon in possession prosecutions, "Congress intended the 'allowable unit of prosecution' to be an incident of possession regardless of whether a defendant satisfied more than one § 922(g) [felon in possession] classification, possessed more than one firearm, or possessed a firearm and ammunition."  439 F.3d 421, 422 (8th Cir. 2006) (en banc) (citations omitted).  The government notes "that Counts 1 and 2 were multiplicitous given that the firearm and ammunition were possessed simultaneously."[2]

It is often appropriate to charge a defendant with being a felon in possession of a firearm and ammunition in separate counts because, for a variety of reasons, the charges may prove to be separate crimes, for example, when the defendant acquired the firearm and ammunition at different times and in different places.  <u>See</u> <u>United States v. Woolsey</u>, 759 F.3d 905, 908 (8th Cir. 2014).  But here, we agree with government that the two counts as proved at trial are multiplicitous -- Haynes obtained, possessed, and used the firearm and ammunition in a single "incident of possession."

The appropriate remedy is a more difficult question.  The district court did not commit plain error by not dismissing one count of the indictment as multiplicitous before trial -- the two different acts of possession might prove to be separate crimes, or the government might prove one but not the other, particularly given the different evidence on the commerce element.  <u>See</u> <u>United States v. Johnson</u>, 130 F.3d 1420, 1426 (10th Cir. 1997).  Therefore, no error occurred until the evidence and the verdict established that Haynes was guilty of a single incident of possession.  And our review is for plain error because the issue was first raised by the government on appeal.  The district court imposed concurrent prison sentences.  There was no prejudicial plain error in that, but the imposition of two $100 special assessments was clearly

---

[2]We compliment government counsel for their candor in bringing to our attention an issue that we infer was overlooked in the district court.

established prejudicial multiple punishment.  See Grimes, 702 F.3d at 469; Ray, 481 U.S. at 737.

In these circumstances, it was plain error not to merge the two counts for sentencing purposes.  "[T]he appropriate remedy is to remand with directions to vacate one of the multiplicitous convictions." United States v. Kuhnel, 25 F.4th 559, 566 (8th Cir. 2022) (citation omitted).  We leave to the district court which of the two counts to vacate.  We do not require full resentencing or a new trial.

For the foregoing reasons, we remand for further sentencing proceedings consistent with this opinion and otherwise affirm.

_____